# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CC-00037-SCT

*METHODIST SPECIALTY CARE CENTER*

*v.*

*MISSISSIPPI DIVISION OF MEDICAID AND*
*DREW SNYDER, IN HIS OFFICIAL CAPACITY*
*AS DIRECTOR OF THE MISSISSIPPI DIVISION*
*OF MEDICAID*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/14/2018 |
| TRIAL JUDGE: | HON. PATRICIA D. WISE |
| TRIAL COURT ATTORNEYS: | JANET McMURTRAY |
| | DION SHANLEY |
| | THOMAS L. KIRKLAND |
| | BEA TOLSDORF |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | ANDY LOWRY |
| | THOMAS L. KIRKLAND |
| | BEA TOLSDORF |
| ATTORNEYS FOR APPELLEES: | JANET McMURTRAY |
| | SAMUEL P. GOFF |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  LAURA L. GIBBES |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 05/28/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., MAXWELL AND CHAMBERLIN, JJ.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.    Methodist Specialty Care Center is the only nursing facility for the severely disabled

(NFSD) in the state.  NFSDs generally incur higher costs than other nursing facilities, and

because of this, Methodist receives a percentage adjustment to its new-bed-value (NBV) calculation when the Mississippi Division of Medicaid (DOM) determines how much it should reimburse Methodist for its property costs through the DOM's fair-rental system. A NBV is intended to reflect what it would cost to put a new bed into service in a nursing facility today. Methodist had received a NBV adjustment of 328.178 percent added to the standard NBV every year since it opened in 2004 until State Plan Amendment (SPA) 15-004 was enacted.

¶2. In 2012, the Mississippi Legislature directed the DOM to develop a plan to revise its reimbursement methodology for nursing facilities. The DOM complied and submitted its recommendations for revisions to the Legislature in January 2014. During the 2014 Regular Session, the Legislature passed House Bill 1275, which authorized the DOM to update and revise several provisions within the State Plan. In 2015, the DOM's revisions were enacted in SPA 15-004. SPA 15-004 substantially increased the standard, universally applied NBV for all nursing facilities in the state. The amendment also changed the NFSD's NBV adjustment rate and formula. Since Methodist opened in 2004, the NFSD's NBV had been calculated by adding 328.178 percent to the standard NBV, but the originally intended version of SPA 15-004 proposed to change the NFSD's NBV to be 175 percent of the standard NBV. These changes to Methodist's adjustment rate made it experience a substantial decrease in its NBV, while all other nursing facilities in the state were receiving an increase in their NBVs.

¶3. Aggrieved by the decrease in its NBV, Methodist appealed the DOM's changes to its

2

NBV that were enacted in SPA 15-004. The DOM initially denied Methodist's appeal based on Methodist's failure to take issue with the amendment during the public-notice and comment period. After receiving notice of the denial, Methodist renewed its appeal, and the DOM agreed to hold an administrative hearing on the matter.

¶4. After the hearing, the administrative hearing officer (AHO) submitted his opinion to the DOM. The AHO found that the DOM had properly proposed and implemented SPA 15-004 and upheld the decreased percentage adjustment to Methodist's NBV. The AHO, however, also determined that the DOM had miscalculated Methodist's NBV adjustment. The DOM had planned to calculate Methodist's adjustment as 175 percent of the base NBV, but the AHO found that Methodist's adjusted NBV should be calculated in the same manner as it was calculated preamendment—by taking 175 percent of the standard NBV and adding that value to the standard NBV. The AHO's correction to the formula adjusted Methodist's NBV for 2015 from $159,800 to $250,800.

¶5. The DOM's executive director affirmed the AHO's opinion and adopted it as the DOM's final decision on the matter. Methodist still felt aggrieved because its NBV adjustment rate had not been restored to the preamendment rate. Methodist appealed the DOM's final decision to the Chancery Court of the First Judicial District of Hinds County. The chancellor affirmed the DOM's final decision. Methodist now appeals to this Court.

## FACTS AND PROCEDURAL HISTORY

¶6. Methodist is the only NFSD in the state. An NFSD is a long-term-care facility that specializes in the treatment of individuals with severe disabilities, including spinal-cord

3

injuries, closed head injuries, permanent ventilator-dependent patients, permanent tracheotomy patients, quadriplegia patients and other patients who require total and maximum assistance with daily living activities.

¶7.     In 2000, Methodist applied for a certificate of need (CON) seeking to construct Mississippi's first long-term nursing facility for the severely disabled and listed the projected cost of building such a facility at approximately $7.5 million.  Because no such facility had been built within the state before, the DOM and Methodist worked together at the outset of the NFSD's creation to come up with a reimbursement methodology that would fairly compensate Methodist for the cost of constructing the facility.  Before the facility was ever built, the two parties agreed that the DOM would need to adjust Methodist's new-bed rate by 328.178 percent in order to fairly compensate Methodist for its incurred property costs for construction of the NFSD.  Methodist's adjustment rate was added to the State Plan at Chapter 3-4.

¶8.     Four categories of nursing facilities  receive adjustments  to their NBVs—intermediate-care facilities for the intellectually disabled (ICF/IID), psychiatric residential-treatment facilities (PRTF), Alzheimer's units and NFSDs. Since Methodist first began operating in 2004, its property-reimbursement rate was calculated by taking adding 328.178 percent of the standard NBV to the standard NBV amount.   This manner of calculation effectively set Methodist's reimbursement rate at 428.178 percent of the standard NBV.  Alzheimer's units are also calculated in this "percentage plus" manner, and Alzheimer's units' adjustment percentage is also provided in Chapter 3-4 of the State Plan.

The adjustment percentages for ICF/IIDs and PRTFs are not stated within Chapter 3-4. Both ICF/IIDs and PRTFs have their NBV adjustments calculated by taking their stated percentage adjustment of the standard NBV, but the standard NBV is not added to the percentage.

¶9. In 2012, the Legislature passed House Bill 421. House Bill 421 directed the DOM to "develop a plan providing revisions to the current reimbursement methodology for nursing facility services." H.B. 421, Reg. Sess., 2012 Miss. Laws ch. 530, § 5. In response to the legislation, the DOM created a Nursing Facility Reimbursement Methodology Revision Committee (Committee) comprised of DOM personnel, industry people and other concerned stakeholders. The Committee reached an agreement on a new reimbursement plan, and the DOM submitted its proposed plan to the Legislature in January 2014. The report stated that the Committee recommended that updates be made to the DOM's fair-rental-value calculation, as follows:

- Increase the value of a nursing facility bed to $91,200,
- Increase the annual depreciation amount from 1% to 1.75% for all long-term care facilities,
- Increase the maximum allowed depreciation from 30% to 50% for all long term care facilities, and
- Decrease the rental factor from 7.5% to 5.35% while maintaining the 2% risk premium for all long-term care facilities.

The report did not include any proposed changes to percentage adjustments to the NBVs for those facilities that received them.

¶10. After reviewing the Committee's report, the Legislature passed House Bill 1275 during the 2014 session. House Bill 1275 stated that

5

> On or after January 1, 2015, the division shall update the case-mix payment system resource utilization grouper and classifications and fair rental reimbursement system. The division shall develop and implement a payment add-on to reimburse nursing facilities for ventilator dependent resident services.

H.B. 1275, Reg. Sess., 2014 Miss. Laws ch. 488, § 1 (codified as amended at Miss. Code Ann. § 43-13-117(A)(4)(d) (Rev. 2015)). House Bill 1275 was signed by the governor, and this portion of the bill became Mississippi Code Section 43-13-117(A)(4)(d).

¶11. After receiving the Legislature's directive to update the nursing facility fair-rental-reimbursement system, the DOM began drafting amendments to the State Plan in November and December of 2014. It was not until the DOM actually started writing the amendments to the State Plan that it first examined the adjusted-bed values of ICF/IIDs, PRTFs, Alzheimer's units, and NFSDs. While examining the adjusted NBVs, the DOM noticed that under the old rates, Methodist had almost completely recouped its initial investment in just eleven years. This fact, coupled with the DOM's fear that Methodist would receive a windfall as a result of the rebased NBV led the DOM to make one of its last changes to the SPA before submitting it for approval to CMS and decreasing the NFSD's adjustment from 328.178 percent to 175 percent. If Methodist's NBV continued to be adjusted with a 328.178 percent add-on after the standard NBV was rebased as $91,000 in SPA 15-004, then Methodist's NBV would skyrocket from $226,638.92 in 2012 to $390,498.00 in 2015—an increase of $163,859.08 per bed.

¶12. In December 2014, the DOM published notices in several newspapers of the proposed changes to its long-term-care facility-reimbursement methods—SPA 15-004—as required

by the public-notice requirements of 42 C.F.R. § 447.205, Westlaw (current through May 21, 2020). The public-notice and comment period ran for a month, from December 18, 2014, to January 18, 2015. The public notice provided that a copy of the proposed SPA was available for review in each county health-department office. The copies of the SPA that were available for review included the change to Methodist's NBV adjustment. Methodist claims, however, that because it was expecting a slight increase to its per diem rate and because changes implemented in the SPA were difficult to discern from one version of the State Plan to its revised version, Methodist did not find out about the change in is property rate until March 9, 2015—well after the public-notice and comment period had lapsed.

¶13. After the period lapsed and the DOM received no comments from the public on the amendment, the DOM filed SPA 15-004 for approval with the federal Centers for Medicare and Medicaid Services (CMS).

¶14. Methodist appealed its rate on April 8, 2015, and the DOM and Methodist met to discuss the change in the adjustment on May 19, 2015. At the meeting Methodist argued that this decreased adjustment rate was not based on construction costs, but the DOM was unconvinced by its arguments. On July 7, 2015, the DOM notified Methodist that because Methodist's property-rate calculation complied with SPA 15-004 and because Methodist failed to comment on the amendment when it was placed for public notice and opened for comments, Methodist's appeal had been denied. Upon receipt of the denial, Methodist renewed its motion, and, on July 23, 2015, the DOM agreed to conduct an administrative hearing on the matter.

¶15. The administrative hearing was held on January 26 and 27, 2016. On the second day of the hearing, the DOM filed SPA 16-0011 for public comment. The DOM testified that it intended for SPA 16-0011 to clarify that the DOM originally intended for a 175 percent multiplier, rather than the 175 percent add-on, to be used to calculate an NFSD's NBV adjustment under SPA 15-004. If approved, SPA 16-0011 was to retroactively take effect on January 1, 2016.

¶16. At the hearing, the DOM explained its reasoning and basis for the changes made to the State Plan by SPA 15-004 for the rebasing of the standard NBV and for the 175 percent multiplier applied to NFSDs. Methodist argued that the DOM failed to appropriately publish notice of the changes included in SPA 15-004, and Methodist further argued that the property per diem rates must be based on new construction costs. Methodist had an expert testify that the actual cost of building an NFSD in 2015 would amount to $17,717,169, or $295,268 per new bed. This estimate included an approximate cost for acquiring the land upon which Methodist currently stands and already owns. Methodist's expert estimated that the cost to acquire the land in 2015 would be $2,427,152 and based his approximation on recent sales of nearby parcels of land. The AHO noted in his opinion that the resulting increase in the estimated actual NBV could be the result of the "extraordinary increase in land acquisition costs." If the greatly increased value of the land that Methodist already owns, and therefore would not have to purchase again, were taken out of the estimated actual construction-cost equation, the estimated total actual cost to construct an NFSD in 2015 would amount to $15,290,017, or $254,833.62 per bed.

8

¶17. Following the hearing, the AHO issued his opinion and recommendations on May 26, 2016. The AHO upheld the 175 percent NBV adjustment for NFSDs but held that the NBV adjustment for NFSDs should be calculated according to the formula that had been implemented since the NFSDs first opened in Mississippi, by adding the standard NBV to 175 percent of the standard NBV. According to the AHO's opinion, which was later affirmed and adopted by the DOM as the DOM's final decision, Methodist's NBV calculation for 2015 would be $91,200 + ($91,200 x 1.75), which would equal $250,800 per new bed in 2015. The AHO's NBV calculation puts Methodist's adjusted NBV at an amount slightly greater than 98 percent of its estimated actual cost to construct a new bed when the cost of acquiring the land that Methodist already owns is taken out of the estimated total construction costs.

¶18. According to Methodist's own expert, the estimated actual cost to construct an NFSD in 2015, including the cost to acquire land which Methodist already owns, brought the cost to construct a new facility to $295,286 per new bed. The dissent points out that the AHO's prescribed NBV—$250,800—amounts to only 85 percent of the estimated actual cost to construct a new NFSD in 2015, including the cost to acquire the land Methodist already owns. But in 2004, right after Methodist and the DOM agreed that Methodist should receive a 328.178 percent add-on adjustment to its NBV property payment, Methodist's adjusted NBV for 2004 amounted to $139,050.81 and the actual cost to construct Methodist came to $169,108, making Methodist adjusted NBV property-payment amount only 79 percent of Methodist's actual construction costs.

9

¶19. On June 24, 2016, the DOM's executive director affirmed and adopted the AHO's opinion as the DOM's final decision on the matter. Methodist is now appealing the DOM's final decision, which set Methodist's NBV-adjustment calculation as the standard NBV added to 175 percent of the NBV. In accordance with the AHO's opinion, the DOM's final decision also held that SPA 15-004 had been properly published for public notice and that the DOM complied with House Bill 421 and House Bill 1275.

¶20. Although, the DOM's final decision adjusted Methodist's reimbursement formula to a rate more favorable for Methodist than what the DOM had originally intended with SPA 15-004, Methodist still felt aggrieved because its NBV was still being adjusted by a percentage amount less than what it had been before the amendment was enacted.[1]

¶21. Methodist timely appealed the DOM's final decision to the Hinds County Chancery Court. The case was briefed in 2017, and a hearing was held in July 2017. On December 14, 2018, the chancellor issued her order and opinion, which affirmed the DOM's final decision. Methodist timely appealed to this Court.

**STANDARD OF REVIEW**

¶22. "When reviewing a chancellor's ruling concerning an administrative agency decision, this Court applies the same standard of review as the chancellor." *Crossgates River Oaks Hosp. v. Miss. Div. of Medicaid*, 240 So. 3d 385, 387 (Miss. 2018) (citing *Miss. Comm'n*

---

[1]If Methodist were to receive its preamendment calculation and percentage-adjustment rate after the standard NBV was rebased as $91,200, then Methodist would receive an adjusted NBV amounting to $390,498, which exceeds Methodist's own expert's estimated actual cost of construction per bed by $95,212 per bed.

*on Envtl. Quality v. Chickasaw Cty. Bd. of Supervisors*, 621 So. 2d 1211, 1216 (Miss. 1993)). "This court has the authority to reverse the decision of DOM if we find that it (1) was not supported by substantial evidence, (2) is arbitrary or capricious, (3) was beyond DOM's power to adopt, or (4) violates a constitutional or statutory provision." *Id.* (citing *Town of Enterprise v. Miss. Pub. Serv. Comm'n*, 782 So. 2d 733, 735 (Miss. 2001)).

¶23. An agency's interpretation of a statute or an administrative regulation or rule governing the agency's operation is a matter of law reviewed *de novo*, but the level of deference the Court will afford the agency's interpretation of the law depends on whether the agency is interpreting a statute or its own administrative regulation or rule. *King v. Miss. Military Dep't*, 245 So. 3d 404, 407 (Miss. 2018); *see also Crossgates*, 240 So. 3d at 388 (citing *Sierra Club v. Miss. Envtl. Quality Permit Bd.*, 943 So. 2d 673, 678 (Miss. 2006)). The Court will afford no deference to an agency's interpretation of a statute governing the agency's operation. *King*, 245 So. 3d at 407–08. But, an agency's interpretation of its own administrative rules and regulations which govern the agency's operations will generally be afforded great deference by the Court. *Crossgates*, 240 So. 3d at 387–88. The Court will not uphold nor will it afford any deference to an agency's interpretation of its own administrative regulation or rule if the interpretation is so erroneous or inconsistent with the underlying rule or regulation as to make the agency's interpretation arbitrary, capricious or an abuse of discretion. *Id.*

¶24. The party challenging the decision of the agency has the burden to prove that the agency's decision should not be affirmed by the court because the agency's decision was not

11

supported by substantial evidence, was arbitrary or capricious, was outside the scope of the agency's power or violated a statutory or constitutional right of the aggrieved party. *Ray v. Miss. Dep't of Pub. Safety*, 172 So. 3d 182, 187 (Miss. 2015) (citing *Bd. of Law Enf't Officers Standards and Training v. Butler*, 672 So. 2d 1196, 1199 (Miss. 1996); *Montalvo v. Miss. State Bd. of Med. Licensure*, 671 So. 2d 53, 56 (Miss. 1996)).

¶25. "Our courts are not permitted to make administrative decisions and perform the functions of an administrative agency. Administrative agencies must perform the functions required of them by law." *Pub. Emps.' Ret. Sys. v. Howard*, 905 So. 2d 1279, 1284 (Miss. 2005) (quoting *Miss. State Tax Comm'n v. Miss.-Ala. State Fair*, 222 So. 2d 664, 665 (Miss. 1969)). "[T]he [reviewing] court is not authorized to substitute its judgment for that of the [agency] where there is substantial (that is, more than a scintilla of) evidence to support the finding." *Ray*, 172 So. 3d at 187 (alterations in original) (internal quotation marks omitted) (quoting *Montalvo*, 671 So. 2d at 56).

## DISCUSSION

¶26. Methodist argues that the DOM erred by reaching and implementing its final decision[2] to change Methodist's NBV adjustment to a 175 percent add-on. Methodist also argues that the DOM erred by violating state and federal laws of required notice for proposed changes in agency rules and regulations and by failing to comply with the directives of House Bill 421 and House Bill 1275.

---

[2]The opinion of the AHO was affirmed and adopted in totality by the DOM as the agency's final decision on the matter. Methodist is appealing the conclusions that were reached by the AHO in his opinion and then later adopted as the DOM's final decision.

## I.     Whether the DOM erred by adjusting Methodist's NBV.

¶27.    Methodist argues that the DOM's adjustment of Methodist's NBV was erroneous because the adjustment was not based on new-construction costs or the fair-rental system and because the DOM's basis for changing the NBV was arbitrary and capricious.  Methodist asks that this Court hold that new-construction costs must be the basis for adjustments made to NBVs.

### A.     *Basis for Adjustment to Methodist's NBV*

¶28.    Methodist argues that NBVs are based on what it would currently cost to build a new facility and that the 175 percent add-on adjustment to the standard NBV that it receives was not based on what it would cost to build a new NFSD in 2015.  Methodist argues that the DOM came up with the new 175 percent adjustment based on what it felt would be a fair and reasonable property rate for Methodist or came up with this percentage based on Methodist's reported costs.  But the AHO found that this 175 percent add-on would fairly reimburse Methodist for what it would cost to construct an NFSD today. Additionally, the record provides that the DOM's discovery that Methodist had nearly recouped its entire initial investment for constructing the NFSD in just eleven years under the old adjustment rate coupled with the DOM's fear that Methodist would receive a windfall from the rebased NBVs led the DOM to make one of its last few changes to the SPA.  The dissent mistakenly claims that the DOM's logic asks why the DOM pays Methodist, or any other facility that has fully recouped the cost of building it, any amount for a property payment under the fair-rental system after the facility has been completely reimbursed for what it actually cost to construct

13

the facility. But this is clearly not the DOM's logic because Methodist has nearly received the total amount that it cost to construct it, and the DOM never suggests ceasing Methodist's property payments. The DOM merely seeks to analyze the property-payment data that had been collected the past ten years for the state's only NFSD to check that the NBV adjustment that was agreed upon by the DOM and Methodist in 2004, when Methodist first opened, is adequately reimbursing the NFSD and to reevaluate the NBV adjustment rate if not.

¶29. The DOM explains that the Committee used actual reported costs listed in recently issued CONs to determine that the standard NBV of a nursing facility should be increased to $91,200. The DOM explained that the standard NBV is the starting point for every nursing facility's fair-rental per diem calculation, then improvements are considered and a depreciation factor is applied. All of this is done in an effort to reimburse providers for construction costs based upon the age of the facility. The age of the facility is considered to provide an incentive for facilities to continuously invest in and improve their facilities. The dissent claims that the DOM's position ignores the fair-rental system's intention to promote renovations and improvement to facilities, but this claim contradicts the language that the dissent earlier quoted from the DOM's own argument, stating that the "DOM calculated a rate which would continue to compensate Methodist and encourage it to invest in and maintain its facility." Diss. Op. ¶¶ 104, 109.

¶30. We find Methodist's claim that all percentage-adjustment rates that are afforded to certain categories of nursing facilities' NBVs must be based on what it would cost to construct a new facility of that type today to be without merit. Methodist has cited no

14

relevant authority to support that contention. While it is clear that NBVs are based on what it would cost to construct a nursing facility today, no authority has been cited that mandates that the additional percentage adjustments that NFSDs, ICF/IIDs, PRTFs or Alzheimer's units receive in their property-payment calculations must be based on construction costs.

¶31. Notwithstanding Methodist's failure to cite authority to support its claim, we find that the DOM's final decision to calculate Methodist's NBV adjustment with a 175 percent add-on was reached by considering what it would cost to build a new NFSD today. Therefore, Methodist's argument that its new NBV-adjustment rate was reached in error because it was not based on new-construction costs is moot. Any error the DOM may have originally made in determining Methodist's NBV adjustment in SPA 15-004 was ultimately harmless because, as the AHO explained in his opinion, the 175 percent add-on would reasonably compensate Methodist for what Methodist's own expert estimated it would cost to construct an NFSD today. The AHO's reasoned analysis for why the 175 percent add-on reasonably compensates Methodist for what it would cost to construct a new NFSD in 2015 was adopted by the DOM as its final decision. Therefore, the DOM's final decision reasoned that Methodist's new-construction costs would be met by adjusting Methodist's NBV with a 175 percent add-on.

### B. Were the DOM's actions arbitrary and capricious?

¶32. Methodist argues that the DOM acted arbitrarily and capriciously by singling out Methodist for a reduction of its adjustment rate, by failing to apply a rule of general applicability to Methodist in a consistent manner and by failing to articulate a reason for

15

deviating from its prior norms and decisions.

¶33. "An administrative agency's decision is 'arbitrary' when it is not done according to reason or judgment, but depending on the will alone." *Pub. Emps.' Ret. Sys. v. Marquez*, 774 So. 2d 421, 429 (Miss. 2000) (citing *Burks v. Amite Cty. Sch. Dist.*, 708 So. 2d 1366, 1370 (Miss. 1998); *McGowan v. Miss. State Oil & Gas Bd.*, 604 So. 2d 312, 322 (Miss. 1992)). This Court has also stated that an act of an administrative agency "is 'capricious' if it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surround fact and settled controlling principles." *Id.* at 429–30 (citing *Burks*, 708 So. 2d at 1370; *McGowan*, 604 So. 2d at 322).

¶34. "[A]n agency must either conform to its prior norms and decision or explain the reason for its departure from such precedent." *Miss. Methodist Hosp. and Rehab. Ctr., Inc. v. Miss. Div. of Medicaid*, 21 So. 3d 600, 609 (Miss. 2009) (internal quotation marks omitted) (quoting *Miss. Valley Gas Co. v. Fed. Energy Reg. Comm'n*, 659 F.2d 488, 506 (5th Cir. 1981)), *abrogated on other grounds by King*, 245 So. 3d 404.

¶35. Methodist argues that the DOM's explanation for such a departure from its previous norms or decisions must be more than a mere placeholder and that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored . . . ." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1971). Here, the DOM complied with both.

¶36. The DOM acted in accordance with its previous norms and decisions by basing Methodist's NBV-adjustment rate on what it would cost to construct an NFSD today. The

16

DOM's only departure from its previous practices relevant here was the change in Methodist's NBV-adjustment percentage amount. The DOM's final decision adopting the AHO's opinion provided a well-reasoned analysis for why it was necessary to depart from the 328.178 percent add-on adjustment and move to a 175 percent add-on for Methodist. The DOM explained that if it were to conform with the 328.178 percent add-on after the standard NBV was drastically increased, then the DOM would be overpaying Methodist for what it would cost to construct the facility by nearly $100,000 per bed. The AHO's opinion also notes that because Methodist is the only NFSD in the state, the effort to establish a NBV is complicated by the fact that there are few such comparable facilities in the country.

¶37.     Methodist also asserts that the DOM's actions were arbitrary and capricious because it failed to apply a rule of general applicability. Methodist argues that the rule of general applicability here is that the fair-rental value be based on the cost to construct a new facility in the present day. Again, Methodist's argument is without merit because its adjusted fair-rental value was, in fact, based on what it would reasonably cost to construct a new NFSD in the present day, as explained in the DOM's final decision.

¶38.     After reviewing the record, we find that the DOM's final decision to change Methodist's adjustment rate to a 175 percent add-on was supported by substantial evidence and was not arbitrary or capricious

### C.     Correct Basis for NBVs

¶39.     Methodist asks that this Court hold that NBV adjustments must be based upon new construction costs, arguing that the AHO's formula was not supported by substantial

17

evidence and that the DOM's affirmation and adoption of the AHO's opinion as the DOM's final decision was mere pretense.

¶40. This Court is not allowed to do the job of administrative agencies and cannot substitute its own opinion in place of an agency decision. *Ray*, 172 So. 3d at 187. Accordingly, we refuse to dictate how the DOM bases adjustments to NBVs absent any showing that such a rule exists or that the DOM has failed to act in accordance with such rule.

¶41. Methodist further argues that the DOM's adoption of the AHO's opinion as its final decision on the matter was mere pretense because the DOM filed another SPA for public notice and comment that attempted to clarify whether the 175 percent adjustment for Methodist was a multiplier or an add-on. The amendment to which Methodist is referring was to take effect January 1, 2016, but the DOM affirmed and adopted the AHO's opinion on June 24, 2016. The fact that the AHO's opinion became the DOM's final decision on the matter well after the clarifying amendment took effect weighs heavily against a finding that the DOM's affirmation and adoption of the AHO's opinion was mere pretense. The DOM's affirmation and adoption of AHO's opinion as the DOM's final decision on the matter was clearly meant to overrule any preexisting rules or decisions on the matter. Therefore, we find Methodist's contention to be without merit.

> **II.     Whether the DOM violated state and federal laws requiring notice.**

¶42. Methodist argues that the DOM failed to comply with 42 C.F.R. § 447.205, the federal regulation requiring that state Medicaid agencies "provide public notice of any significant

18

proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205(a), Westlaw (current through May 21, 2020). Methodist claims that the DOM also failed to comply with several state laws requiring public notice of an agency's proposed rule changes.

### A.    Federal Law Requiring Public Notice

¶43.    If a state chooses to participate in the Medicaid program, it must submit a State Plan to CMS that satisfies the substantive requirements of 42 U.S.C. § 1396a (a)(13)(A) (2012), and the procedural requirements set forth in 42 C.F.R. § 447.200, Westlaw (current through May 21, 2020). Any later changes in the payment rates established in the State Plan require the state Medicaid agency to submit proposed plan amendments to CMS for approval. 42 C.F.R. § 447.205 requires a state agency "provide public notice of a significant proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205, Westlaw (current through May 21, 2020). Subsection (c) of the regulation outlines the content requirements of the public notice, stating that the notice must include a description of the proposed change in methods and standards, estimates of any expected increase or decrease in annual aggregate expenditures and an explanation for why the agency is changing its methods and standards. 42 C.F.R. § 447.205(c), Westlaw (current through May 21, 2020).

¶44.    Here, the DOM's published notice gave a detailed description of several of the proposed changes that the SPA 15-004 would implement, stated that the "estimated annual aggregate expenditure of the [DOM] are expected to be budget neutral" and explained that

19

the DOM was "implementing these changes to nursing facility reimbursement as authorized by Miss. Code Ann. Section 43-13-117."

¶45.   "As their name suggests . . . 'notice' provisions are neither invariably nor primarily designed to afford exhaustive disclosure, but to alert interested parties that their substantive rights may be affected in a forthcoming public proceeding." *Visiting Nurse Ass'n of N. Shore, Inc. v. Bullen*, 93 F.3d 997, 1010 (1st Cir. 1996), *abrogated on other grounds by Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50 (1st Cir. 2004). "Notice provisions require only that the agency 'outline[] the substance of the plan in sufficient detail to allow interested parties to decide how and whether to seek more information on the plan's particular aspects.  The agency was not required to publish every minute detail of the plan.'" *Id*, (quoting *Miss. Hosp. Ass'n v. Heckler*, 701 F.2d 511, 520 (5th Cir. 1983)).

¶46.   Methodist relies on a case from the United States Court of Appeals for the Fourth Circuit to argue that an agency's failing to provide public notice of an amendment proposing significant changes to the agency's methods and standards renders the amendment ineffective until proper public notice is published.  *N.C. Dep't of Human Res. v. U.S. Dep't of Health & Human Servs.*, 999 F.2d 767, 768 (4th Cir. 1993).  In that case, however, the portion of the SPA at issue proposed a retroactive effective date.  The Health Care Financial Administration (HCFA) Administrator approved the substance of North Carolina's SPA but denied the portion that specified the retroactive effective date, reasoning that the significant change to the agency's methods and standards could not become effective retroactively because it would be impossible to give public notice before the retroactive effective date.

20

*Id.* Therefore, any SPA proposing a retroactive effective date cannot be in compliance with 42 C.F.R. § 447.253(h), Westlaw (current through May 21, 2020), which requires that the state Medicaid agency provide CMS with assurances that it has complied with the public-notice requirements of 42 C.F.R § 447.205 before CMS will approve the plan change. *Id.*

¶47. Here, the AHO determined that "Methodist was aware that a general increase of NBVs was imminent and that changes to its adjustment percentage were being considered." The AHO further found that the publication of the notice was proper and that the notice set forth a comment period but that no comments were received.

¶48. Methodist argues that the AHO's claim that Methodist knew that changes to its percentage were being considered was pure fabrication. Although the AHO does not cite specific evidence from the record to support his finding, it is evident from the record that Methodist had actual knowledge that some change to their adjusted NBV was imminent. A Methodist employee testified at the administrative hearing and stated that he had participated in the webinars and had seen that Methodist's proposed NBV was $299,298 for 2015. At this moment, Methodist either knew or should have known that the manner in which Methodist's NBV adjustment was calculated was going to change under SPA 15-004. Methodist knew that under SPA 15-004, the standard NBV would be rebased to $91,200, and according to the simulation letters and the DOM's training webinars, Methodist knew its expected NBV would be $299,298. At the administrative hearing, a reimbursement consultant for Methodist testified that Methodist's expected NBV, $299,298, was consistent with the 328.178 percent add-on that had been used to calculated Methodists adjusted NBV since 2004. This was not

21

true though. If Methodist had done the math, it would have realized that 328.128 percent of $91,200 is $299,298 and that SPA 15-004 was proposing to change Methodist's NBV adjustment calculation to a 328.178 percent multiplier rather than the 328.178 percent add-on that Methodist had received in past years. Methodist's simulation letter from the DOM calculated Methodist's NBV adjustment with a 328.178 percent multiplier, instead of a 328.178 add-on as well. After receiving this notice, Methodist failed to raise an issue with this change, but now Methodist insists that it is still entitled to a 328.178 percent add-on adjustment for its NBV.

¶49. The DOM's publication of notice included all of the information it was required to address according to 42 C.F.R. § 447.205, including information about where a copy of the SPA could be found to review the entire document. Pursuant to CMS's requirements, the DOM published the proposed SPA 15-004 on its website, which was accessible by all Medicaid providers. And, as the published notice stated, the DOM provided a copy of the SPA to each satellite Health Department location in all eighty-two counties. These copies of the SPA, which were available to the public for review, included the change to Methodist's NBV adjustment to 175 percent.

¶50. After reviewing the record, we find that the DOM complied with federal laws requiring notice of proposed changes to the State Plan.

### B. State Laws Requiring Public Notice

¶51. Methodist argues that the DOM violated state laws that require public notice of proposed changes to state agency rules, which are to be published through the Mississippi

Secretary of State's office in the administrative bulletin.

¶52. "The [DOM] is an agency as defined under Section 25-43-3 and, therefore, must comply in all respects with the Administrative Procedures Law, Section 25-43-1 et seq." Miss. Code Ann. § 43-13-137 (Rev. 2015). "At lease twenty-five (25) days before the adoption of a rule an agency shall cause notice of its contemplated action to be properly filed with the Secretary of State for publication in the administrative bulletin." Miss. Code Ann. § 25-43-3.103(1) (Rev. 2018). The Mississippi Code further provides,

> The Secretary of State retains the authority to reject proposed and newly adopted rules not properly filed in accordance with the Secretary of State's rules prescribing the numbering system, form, style or transmitting format for such filings. The Secretary of State shall not be empowered to reject filings for reasons of the substance or content or any proposed or newly adopted rule. The Secretary of State shall notify the agency of its rejection of a proposed or newly adopted rule as expeditiously as possible and accompany such notification with a stated reason for the rejection. A rejected filing of a proposed or newly adopted rule does not constitute filing pursuant to Section 25-43-3.101 et seq. of this chapter.

Miss. Code Ann. § 25-43-2.101(4) (Rev. 2018). "A rule adopted after July 1, 2005 is invalid unless adopted in substantial compliance with the provision of Sections 25-43-3.102 through 25-43-3.110." Miss. Code Ann. § 25-43-3.111(1) (Rev. 2018).

¶53. Although Methodist correctly argues that the DOM is an agency subject to the same requirements of other state agencies and is required to substantially comply with notice requirements for newly adopted or proposed rules, the DOM argues that the State Plan is not a "rule" of the agency but rather a contract between the Medicaid office and the federal government that delineates how the state agency will appropriate the funding it receives from the federal government.

23

¶54. The Centers for Medicare and Medicaid Services (CMS) is the federal agency responsible for ensuring that state Medicare and Medicaid agencies comply with federal law and the federal agency's requirements for receiving funding. CMS describes the contractual nature of state plans on its website, stating,

> A Medicaid and CHIP state plan is an agreement between a state and the Federal government describing how that state administers its Medicaid and CHIP programs. It gives an assurance that a state will abide by Federal rules and may claim Federal matching funds for its program activities. The state plan sets out groups of individuals to be covered, services to be provided, methodologies for providers to be reimbursed and the administrative activities that are underway in the state.

> When a state is planning to make a change to its program policies or operational approach, states send state plan amendments (SPAs) to the Centers for Medicare & Medicaid Services (CMS) for review and approval. States also submit SPAs to request permissible program changes, make corrections, or update their Medicaid or CHIP state plan with new information.

https://www.medicaid.gov/medicaid/medicaid-state-plan-amendments/index.html (last visited Apr. 14, 2020).

¶55. The DOM offers further support for its argument that the State Plan is not a rule and therefore is not subject to the public-notice requirements of the Mississippi Administrative Procedures Act (APA) by citing a case in which the Louisiana Supreme Court held that "the State Plan is not a rule under the [Louisiana Administrative Procedures Act]." ***Women's and Children's Hosp. v. Dep't of Health and Hosps.***, 2 So. 3d 397, 407 (La. 2009).

¶56. We find CMS's description of SPAs to be controlling here. When CMS's description of SPAs is coupled with the highly persuasive language from the Louisiana Supreme Court, we agree that the DOM's State Plan is not a rule that must comply with the notice

requirements of the Mississippi APA.

### III. Whether the DOM acted contrary to requirements set by the Legislature.

¶57. In 2012, the Legislature directed the DOM to

> develop a plan providing revisions to the current reimbursement methodology for nursing facility services. . . . [DOM] shall not implement these plans, but shall submit the plans to the Public Health and Welfare Committee of the Senate and the Medicaid Committee of the House no later than October 15, 2012, including necessary legislative recommendations.

H.B. 421, Reg. Sess., 2012 Miss. Laws ch. 530, § 5.

¶58. Methodist argues that the DOM violated the letter and spirit of House Bill 421 and acted outside the scope of its legislatively derived authority because the bill mandated that all proposals to revise the reimbursement methodologies pertaining to nursing facilities be submitted to the legislature for review and authorization before the DOM could implement them. We find that the DOM complied with the legislature's directives.

¶59. The DOM responded to House Bill 421 by creating the Nursing Facility Reimbursement Methodology Revision Committee to assist in developing a revised reimbursement methodology for nursing facilities. The DOM chose the option it thought most appropriate and presented it to the Legislature in a legislative report in which the DOM requested legislative authority to implement changes to the current reimbursement methodology for nursing facilities and to revise several provisions of the State Plan, including provisions of the fair-rental-value system.

¶60. We find that the DOM did not violate House Bill 421 or act beyond the scope of its legislatively derived authority because the Legislature clearly limited the DOM to developing

25

a plan for revisions but not the power to implement them. And the DOM's legislative report clearly shows that the DOM never had any intention to implement the recommended changes absent legislative approval.

¶61. "[A] statutory creation[] may only exercise those powers expressly granted or necessarily implied by the Legislature and . . . such powers 'must be found within the four corners of the statute under which the agency operates.'" *Green v. Cleary Water, Sewer & Fire Dist.*, 910 So. 2d 1022, 1026 (Miss. 2005) (quoting *Strong v. Bostick*, 420 So. 2d 1356, 1361 (Miss. 1982)).

¶62. After receiving the DOM's report and recommendations for changes to the State Plan in January 2014, the Legislature drafted and passed House Bill 1275 during the 2014 Regular Session. House Bill 1275 authorized the DOM to "update the case-mix payment system resource utilization grouper and classifications and fair rental reimbursement system." When examining the four corners of the statute, it is clear that the legislature authorized the DOM to update the fair-rental-reimbursement system without including any restrictive or qualifying language. If the Legislature intended to limit the DOM only to enact changes pursuant to the legislative report, then the Legislature would explicitly stated so in House Bill 1275.

<u>CONCLUSION</u>

¶63. After review, we find that the DOM's final decision was supported by substantial evidence, was not arbitrary or capricious, did not violate Methodist's constitutional or statutory rights and that the DOM was acting within its power in reaching and adopting its final decision. We also find that the DOM's final decision to set Methodist's NBV

26

adjustment at a 175 percent add-on depicts what it would reasonably cost to construct a new NFSD today.

¶64. We conclude that the DOM complied with federal requirements for providing public notice of a proposed change in an agency's methods or standards. We further find that the State Plan is not a rule subject to publication requirements under the Mississippi Administrative Procedures Act.

¶65. **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM AND ISHEE, JJ., CONCUR. GRIFFIS, J., DISSENTS WITH SEPARATE WRITTEN OPINION.**

**GRIFFIS, JUSTICE, DISSENTING:**

¶66. I respectfully dissent.

### I. Standard of Review

¶67. In ***Beverly Enterprises v. Mississippi Division of Medicaid***, 808 So. 2d 939, 943 (Miss. 2002), this Court examined the definitions of "arbitrary" and "capricious":

In ***McGowan v. Miss. State Oil & Gas Bd.***, 604 So. 2d 312, 322 (Miss. 1992), this Court defined arbitrary and capricious as follows:

"Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principal; not done according to reason or judgment, but depending upon the will alone,—absolute in power, tyrannical, despotic, non-rational,—implying either a lack of understanding of or a disregard for the fundamental nature of things.

27

"Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding of or a disregard for the surrounding facts and settled controlling principles.

## II. Whether the Division of Medicaid (DOM) erred in adjusting Methodist's NBV.

¶68. The Medicaid reimbursement is complex calculation based on a formula. The methodology at issue here is the computation of the per diem rate for long-term nursing-care facilities. It is set out at chapter 3-4 of the 2015 State Plan. This per diem rate has six listed components, A through F, such as direct-care costs (like caregivers' salaries), case mix (the relative severity of residents' conditions), etc. Here, we consider component E of the per diem rate—the property payment.

¶69. According to subsection E.1 of chapter 3-4, the property payment "includes the fair rental per diem and the property taxes and insurance per diem." Here, we need not consider property taxes or insurance. Instead, we are focused on the "fair rental per diem," which "is a rental payment based on the age of each facility." According to the State Plan, this "fair rental system establishes a facility's value based on its age. The newer the facility is aged, the greater its value." The use of "the fair rental system for property costs" has been mandated by the Legislature since 1993.

¶70. In 2004, Methodist built Mississippi's first and only nursing facility for the severely disabled (NFSD). Methodist's original construction costs totaled $13,580,518, or $169,108 per bed.

¶71. The DOM recognized that NFSDs generally incur higher costs than other nursing facilities. As a result, the DOM and Methodist agreed that the DOM's reimbursement would not be the same as other nursing facilities. Instead, the DOM agreed to reimburse Methodist for such increased costs through a higher new-bed-value (NBV) calculation in the reimbursement formula. The DOM agreed to adjust the NBV and computed Methodist's NBV factor the standard NBV plus 328.178 percent of that amount (the payment add-on). In 2004, the DOM's calculation of the NBV plus the payment add-on was as follows: $32,475 + ($32,475 × 3.28178) = $139,050.81. Thus, in 2004, the DOM's valuation of Methodist's NBV was approximately $30,000 *less than actual cost*. In fact, actual cost was not part of the DOM's formula or the calculation. The formula for Methodist and any NFSD was based on "new bed value."

¶72. According to the DOM, from 2004 through 2014, the DOM paid Methodist $11,851,093 in property payments. The DOM argues that when compared to Methodist's original construction costs, this means through property payments alone, the DOM had almost fully paid for Methodist's building, equipment, land, and renovation of Methodist's current facility before amending the State Plan in 2015, "a fact Methodist's brief attempts to obscure."

¶73. I disagree with the majority and the DOM. I find, as I will explain later, that the DOM's rationale for the change in Methodist's payment add-on from 328.178 percent to 175 percent was arbitrary and capricious. It is not supported by the State Plan or any other authority. As the previous paragraph indicates, the DOM's reasons for reducing the payment

29

add-on was because the DOM thought Methodist had been paid enough or had received a windfall in the DOM reimbursements, neither of which is a reasonable or authorized criterion to reduce the payment add-on factor.

¶74. My conclusion is based on the fact that the DOM's rationale to make this change to the formula solely considered actual-construction costs in comparison to total actual payments received. There is no basis for this rationale. Medicaid does not reimburse based on actual costs. If it did, in 2004, Methodist's NBV would have been $169,108 per bed (the actual cost) and not $138,933.83 (the estimated cost based on the NBV and the payment add-on of 328.178 percent. The DOM gave no consideration to the actual costs of renovations, improvements or other amounts expended by Methodist since 2004. In fact, there is absolutely no authority for the DOM to consider total actual reimbursements paid. Here, Methodist was singled out. In the applicable state-plan amendment (SPA), SPA 15-004, no other category or provider was cut or had their formula reduced based on total actual reimbursements paid.

¶75. Instead, the State Plan uses the term "new bed value." The State Plan defines this a the "new construction value per bed." New-bed value and new-construction value per bed requires that it is based on an estimated amount of current construction costs and inflation. The formula also includes depreciation, which will offset the NBV calculation. The State Plan simply does not authorize the DOM to single out Methodist's total payment history and say that is enough. There is no dispute that the property component of Methodist's reimbursement calculation is based on the estimate of new-bed value and new-construction

30

value per bed, not actual payment history. This is my difference of opinion with the majority, and the majority does not cite authority for the DOM to conclude that Methodist has been "paid enough." At a minimum, based on the legislative authority for these changes, this significant change could have been and should have been vetted by the Nursing Facility Reimbursement Methodology Revision Committee (Committee) or through an actual discussion with Methodist.

¶76.    Therefore, I am of the opinion that the DOM's amendment to Methodist's NBV payment add-on value was arbitrary and capricious. Methodist was held to a different standard, and there is no support for the DOM's accusation of Methodist's having been paid enough for property costs or receiving a windfall.

¶77.    I will explain further.

### A.    The Hearing Officer's Ruling

¶78.    The hearing officer rejected the DOM's calculation of the NBV. Instead, the hearing officer ruled,

> Under the old Plan language, as of 2014, Methodist's new bed value was $226,737.37 (new bed value, $52,954 plus 328.178%). Even though Methodist's own new bed cost estimate is $295,286, it is requesting a cost per bed valuation of $390,498. *Clearly, this is too high.*

> On the other hand, DOM assigned Methodist a new bed value of only $159,600, which is less than the cost of building the facility in 2004. Costs did not go down between 2004 and 2015. *Clearly, this is too low.*

> Methodist was the only nursing home to receive a decrease in new bed value, and its decrease is substantial. However, this decrease was the result of a

31

> mistake in the calculation of the adjustment, as noted above. Using the proper calculation under the new Plan (new bed value, $91,200 plus 175%) provides a new bed calculation of $250,800, which provides Methodist an increase which reasonably represents the competitive cost of constructing a new NFSD bed.

(Emphasis added.)

¶79. The hearing officer gave very little detailed rationale for this decision. The hearing officer gave us no information to base his conclusions of "too high" and "too low." Unlike the DOM, however, the hearing officer simply applied the NBV and the revised payment add-on, as the DOM had done since 2004 in Methodist's calculation. There is no doubt that the hearing officer rejected the DOM's calculation.

### B.     The DOM's Rationale

¶80. The relevant change to SPA-015 considers the calculation of the NBV for Methodist.

¶81. As discussed earlier, the DOM recognized that NFSDs generally incur higher costs than other nursing facilities. To compensate Methodist, DOM agreed to adjust Methodist's reimbursement formula by adding the 328.178 percent payment add-on. To calculate Methodist's NBV, you start with the "New Construction Value" table in the State Plan. For example, in 2004, the standard nursing facility NBV was $32,475. Methodist's NBV calculation for 2004 was: **$32,475 + ($32,475 × 3.28178) = $139,050.81**.

¶82. Continuing this example, Methodist's NBV calculation over the next several years was approximately as follows:

2005          $36,617 + ($36,617 x 3.28178) = $156,785.94

32

| 2006 | $38,174 + ($38,174 x 3.28178) = $163,452.67 |
| 2007 | $40,759 + ($40,759 x 3.28178) = $174,521.07 |
| 2008 | $47,552 + ($47,552 x 3.28178) = $203,607.20 |
| 2009 | $52,622 + ($52,622 x 3.28178) = $225,315.83 |
| 2010 | $50,999 + ($50,999 x 3.28178) = $218,366.50 |
| 2011 | $50,700 + ($50,700 x 3.28178) = $217,086.25 |
| 2012 | $52,954 + ($52,924 x 3.28178) = $226,638.92 |

The DOM agreed that this was the formula used to calculate Methodist's NBV portion of the reimbursement rate from 2004 through 2015.[3]

¶83.    The Legislature began the revision process in 2012.  The Legislature specifically directed Medicaid to "develop a plan" for various reimbursement methodologies, including "a plan providing revisions to the current reimbursement methodology for nursing facility services."  The Legislature also directed that the DOM "*shall not* implement these plans, but shall submit the plans" to the Legislature for its committees to review.  Maj. Op. ¶¶ 9, 57 (emphasis added) (quoting H.B. 421, Reg. Sess., 2012 Miss. Laws ch. 530, § 5).

¶84.    It is crucial that we recognize that these plans and revisions were based on suggestions and recommendations from the Committee.  The Committee included the "DOM personnel,

---

[3] The 2020 NBV for a standard nursing facility is $102,927, Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICF-IID) is $123,512, Psychiatric Residential Treatment Facilities (PRTF) is $123,512, and NFSD is $180,122.

33

industry people and other concerned stakeholders." Maj. Op. ¶ 9. "The Committee reached an agreement on a new reimbursement plan, and the DOM submitted its proposed plan to the Legislature in January 2014." Maj. Op. ¶ 9.

¶85. The report to the Legislature recommended an update to the "Fair Rental Value calculation." Among other recommendations, the report suggested the value of a nursing-facility bed *be increased* to $91,200. The report did not recommend any change to the add-on or percentage adjustments the DOM applied to the NBV calculation for ICF/IIDs, PRTFs, Alzheimer's units, or NFSDs (Methodist).

¶86. The DOM concedes that during the Committee's evaluation process, Methodist was not specifically evaluated for an adjustment to its property rate because of its unique position as the only NFSD in the state of Mississippi.

¶87. The Legislature accepted this report and passed House Bill 1275 in 2014 session. House Bill 1275 authorized the DOM to "update the . . . fair rental reimbursement system." H.B. 1275, Reg. Sess., 2014 Miss. Laws ch. 488, § 1 (codified as amended at Miss. Code Ann. § 43-13-117(A)(4)(d) (Rev. 2015)). The Legislature also instructed the DOM to "develop and implement a payment add-on to reimburse nursing facilities for ventilator dependent resident services." *Id.* In this last sentence, the Legislature referred to the "payment add-on" for ventilators. The report did not suggest or recommend any change to the "payment add-on for specialized nursing facilities." *Id.*

¶88. At this point in the Legislatively mandated revision review, neither the Legislature,

34

the Committee, nor the DOM considered or discussed any possible revision to the NFSD payment add-on factor.

¶89. The DOM admitted that it "first examined the adjusted bed values of specialized nursing facilities, including ICF/IIDs, PRTFs, Alzheimer's units, and the NFSDs (Methodist)[,]" *after* it began drafting the changes. Maj. Op. ¶ 11. The DOM could have and should have considered this issue with the Committee and made a recommendation in the Legislative report. It did not. Despite this, it is clear that at this point, Methodist had no reason to believe its NFSD payment add-on factor would change.

¶90. In fact, the DOM confirmed to Methodist that there would be no change, i.e., decrease in its reimbursement rate. In February 2014, the DOM sent a simulation letter to Methodist that explained how its reimbursement would change if the measures reported to the Legislature were enacted. The letter stated that it presented only "estimates" but that it was meant to show the effect of the proposed changes. Methodist was informed that in comparison to its property per diem rate of $57 under the current system, it could expect a new rate of approximately $69.86 under the new system, which the letter correctly described as a 22.56 percent increase. Again, at this point, Methodist had no reason to believe its NFSD payment add-on would change.

¶91. Further, in November 2014, Medicaid provided online training sessions to help long-term-care providers, like Methodist, understand the proposed reimbursement changes. Richard Lefoldt was a reimbursement consultant for Methodist, and he participated in these sessions. Lefoldt testified that there was no mention of any change to the existing 328.178

35

percent payment add-on to Methodist's NBV. Lefoldt testified about the training slides the DOM presented online. These slides indicated that the general NBV would increase to $91,200. The slides also indicated that while that would be the new-bed value for nursing homes, $299,298 would be used for "NF – Severely disabled," i.e., for Methodist. Finally, Lefoldt testified that this figure was consistent with the 328.178 percent payment add-on that had been used since 2004. Once again, at this point, Methodist had no reason to believe its NFSD payment add-on would change.

¶92. On December 18, 2014, Medicaid published newspaper notices of the changes to its long-term-care reimbursement methods—SPA 15-004. The published notice announced the changes, including five changes to the "Property Rate calculation." These included the NBV increase to $91,200. But the notice did not mention any further change to the NBV specifically for Methodist or for the NFSDs. Again, at this point, Methodist had no reason to believe its NFSD payment add-on would change.

¶93. In fact, neither the hearing officer, the executive director, the chancellor, nor the majority can identify exactly when the SPA 15-004 first included the language that decreased Methodist's payment add-on from 328.178 percent to 175 percent. The majority determined that it was one of the last changes to the SPA 15-004 before it was submitted for approval. Maj. Op. ¶ 11.[4]

------

[4] This finding by the majority contradicts its conclusion later in the analysis of the notice issue that Methodist either knew or should have known of the change. There is no evidence in the record that clearly indicates when the DOM advised Methodist of any change in its NBV and the payment add-on when that would be changed by SPA 15-004.

¶94. Instead, Methodist offered the only evidence about when the DOM decided to make this change. The metadata in the Microsoft Word document of the publication of SPA 15-004 indicated that the DOM had changed SPA 15-004 to reduce Methodist's NFSD payment add-on from 328.178 percent to 175 percent on the same day as publication of the notice. A DOM employee made this change and reduced the NFSB payment add-on from 328.178 percent to 175 percent (under SPA 15-004, Methodist's NBV was $91,200 × 1.75).[5]

¶95. This revision was not presented to, discussed with, or vetted by the Committee or the Legislature. This revision was not provided to Methodist. In 2004, the DOM and Methodist worked together to set this payment add-on. Based on the Legislature's directions, the DOM clearly should have presented this proposed change to the Committee, the Legislature and, at least, Methodist. Furthermore, this change was contrary to the DOM's simulation letter and the training slides. Actually, the simulation letter and the training slides told Methodist to expect a modest increase of $12 to its per diem rate.

¶96. The question here is whether the DOM made this change in an arbitrary and capricious manner. As discussed above, the fact that the DOM did not submit this change to the Committee, the Legislature, or Methodist certainly creates a question as to the DOM's rationale and intentions. As in 2004, it would have been easy for the DOM to disclose this

---

[5] The hearing officer found this was a misreading by Medicaid of its own plan: the same provision that called for "adjustment to the new bed value" for Methodist also stated that an "adjustment to the new bed value of 37.20% will be made for licensed Alzheimer's units." Because that meant the Alzheimer's units would receive a 37.20 percent add-on to the regular new-bed value, it was likewise necessary to read the language to mean an add-on (not multiplier) for Methodist.

37

change and meet with Methodist to discuss this proposed change. Methodist would have been given an opportunity to change the DOM's decision. More importantly, industry professionals would have been given an opportunity to comment on this change. This appears to be the clear intent of the Legislature.

¶97. I move to the DOM's rationale for the change. The DOM claims that it began drafting the amendments to the State Plan in November and December 2014. The draft amendments were to reflect the recommendations reached by the Committee and the report to the Legislature. But at this point, for the first time, the DOM decided to look at the new-bed values of the ICF/IID, PRTF, and NFSD categories of nursing facilities.

¶98. With respect to the NFSD category, the DOM became concerned that as a result of the rebased NBV of $91,200, NFSDs (Methodist was the only NFSD) would receive a windfall that was inconsistent with the legislative directives and goals of House Bill 421. Thus, the DOM reevaluated Methodist's multiplier in an attempt to determine what was *systematically equitable* to all Medicaid providers under the legislative goals presented to the DOM when the process began.

¶99. The DOM reviewed both the ICF/IID and PRTF categories and concluded that a $91,200 base new-bed value would adequately compensate these facilities. Since the base new-bed value was being raised from $52,954 to $91,200 for all facilities, the DOM amended the State Plan to decrease the ICF/IID and PRTF multipliers from 120 percent to 100 percent. But after appeals, the ICF/IID and PRTFs payment add-on were returned to 120 percent.

¶100. Similarly, the DOM evaluated *what rate would fairly compensate a NFSD* consistent with the compensation rates received by all types of nursing facility providers. The DOM ultimately determined that a *fair rental-reimbursement rate* for NFSD facilities (Methodist) would be achieved by utilizing a 175 percent multiplier, for a total adjusted new-bed value of $159,600 ($91,200 x 1.75%).

¶101. The DOM offered the testimony of its reimbursement director, Michael Daschbach. He testified that the NBV payment add-on resulted in an excessive payment to Methodist and would be unfair to other providers:

> Q. And if we pay them $67.89, which is what they've asked for, what is the amount—the gross amount that they would be paid?
>
> A. I'd have to go back to this other sheet. They would be paid almost a million and a half dollars for their property.
>
> Q. And is that more or less than they've ever been paid before?
>
> A. That would be much higher. That would be almost—it would be a million dollars above their costs annually.
>
> Q. And does Medicaid regard that as a fair amount for a property payment for Methodist?
>
> A. No.
>
> Q. And why is that?
>
> A. Because Methodist is the only facility in their class that gets the accelerated payment of 175 percent. This is money that would be spent in other areas. Medicaid is on a finite budget and we've responsible to the taxpayers of Mississippi. We can't just give excess money in one area to the detriment of other areas. I mean, that money can go across multiple programs or other—you know, all kinds of different—you know, it's not fair to other facilities and it's not fair to other types of facilities.

¶102. According to Daschbach, the DOM wanted to change Methodist's NBV payment add-

on because it did not believe it was a fair amount for a property payment.[6] So, he continued,
we should consider what would be a "fair amount for a property payment."

¶103. Because Methodist was the only facility in this category, the DOM decided to use the
historical data it had for Methodist. The DOM claims that the rational to change the NBV
payment add-on to a 175 percent multiplier was supported by Methodist's payment history.

¶104. According to the payment history, the DOM decided that Methodist has already been

> hugely overcompensated for its capital improvements. After the construction
> of Methodist's NFSD was completed in 2004, and as the facility provided
> services to Medicaid patients throughout the years, the property reimbursement
> methodology for this facility was treated differently from the property
> reimbursement formulas applied to other types of nursing facilities. For
> example, unlike the PRTF or IFC/IID facilities, which had their reimbursement
> rates periodically adjusted, Methodist's multiplier was never adjusted, and it
> remained at 328.178% from 2004 through 2012. By comparison, ICF/IID and
> PRTF facilities were compensated prior to 2012 at a rate of 120% of the bed
> value multiplied by the total number of beds in their facilities  Alzheimer units
> were paid the base bed value of all of its beds, plus 37.20% of the bed value
> for each Alzheimer bed.

> In part, the different treatment of the property reimbursement rate for NFSD
> facilities was based on the recognition that it cost more for NFSD facilities to
> house their patients. Thus, from 2004 until 2012, DOM continued to
> compensate Methodist at this disproportionately high rate, in part because of
> its status as the only nursing facility for the severely disabled in the state.

---

[6] Interestingly, if we pause here to consider the notice requirement, 42 C.F.R. § 447.205(a) and (c), Westlaw (current through May 21, 2020) required DOM to "provide public notice of any significant proposed change in its methods and standards for setting payment rates for services" and to "[d]escribe the proposed change in methods and standards," "estimate the increase or decrease expected in  annual expenditures (if any)," and "[e]xplain why the agency is changing its methods  and standards . . . ." As I will discuss in the next section, the DOM did not provide such notice even though the DOM's counsel conceded at the hearing that the change "does drop their property rate. It drops it from $67 to roughly $29. It's a significant drop. There's no question about that."

Based on Methodist's Cost Reports, the total cost of construction for Methodist, together with additions through 2016, totaled $13,207,300. Based on the overages in the rate, Methodist was paid back $12,480,220.97 in property reimbursement by Medicaid alone by 2015, assuming only a 175% payment for 2015. It would have been far more, $13,325,936.29, if Methodist's suggested multiplier of 428.128% had been used for 2015.

Based on DOM's calculations, from the time Methodist opened in 2004 through 2015, Medicaid had already reimbursed Methodist in property payments alone more than the total original costs of constructing the entire facility. This is based only on Medicaid reimbursements and does not include any private pay patients or Medicare reimbursements. Thus, Methodist has recouped almost the entire cost of its facility in a mere 11 years from the property portion of the per diem that Medicaid pays on behalf of Medicaid beneficiaries.

Eleven years is an unbelievably fast return on investment as most depreciation tables are based on 30-40 years. Based on these historical numbers and in light of the Mississippi legislature's directive to tighten the reimbursement methodologies for nursing facilities, DOM could not justify continuing to pay Methodist 428.128% of the newly adjusted base bed value of $91,200, since this would almost double Methodist's property payment and allow Methodist to receive a windfall that would have paid the total cost of its facility a second time in a mere six years. This is not what the property rate is intended to do. Accordingly, DOM calculated a rate which would continue to compensate Methodist and encourage it to invest in and maintain its facility, but would not continue to provide it an unearned windfall that the other nursing facilities did not receive. This is consistent with the legislature's removal of the language that required that nursing facilities for the severely disabled be reimbursed as a separate category of nursing facility.

¶105. Based on this information, it is clear that the DOM's personnel decided that Methodist had been paid enough. But this "paid enough" rationale is not included in the State Plan. The State Plan formula to determine reimbursement, including SPA-015, is based on *new-construction costs* and the *fair-rental system*, which includes a determination as to what is the value of the facility—the cost of constructing a new facility, i.e., NBV. The State Plan

reimbursement formula does not support the significant reduction to Methodist based on the DOM's unilateral conclusion that Methodist has been paid enough.

¶106. The DOM presented no evidence to support the cost of new construction of an NFSD facility. Methodist offered evidence of the current construction cost for an NFSD facility. William Ware, a construction professional, was involved in the original construction of Methodist in 2004. He used industry-cost indexes to estimate that the 2015 construction cost would be $17,717,769. Ware's testimony supported an actual NBV of $295,286 for Methodist. The DOM's revised calculation of NBV was $91,200 x 1.75 = $159,600. Thus, the DOM's revised calculation, based on its conclusion that Methodist had been paid enough, was about half of the actual NBV for Methodist or any other NFSD. Even the hearing officer's NBV—the 175 percent payment add-on to $91,200 + ($91,200 x 1.75) = $250,800—would be an amount that is 85 percent of the actual NBV.[7]

¶107. There is no authority for the DOM's decision to use payment history and historical construction costs to determine the NBV-reimbursement calculation. In fact, the DOM's rationale for the reduction in the payment add-on is because Methodist has been reimbursed most or all of its initial building costs incurred in 2004. The DOM's rationale did not consider the cost of building a new facility. If this were a material consideration, it would (or should) be written into the State Plan, for all facilities, e.g., reduce property rate after startup costs, purchase costs, or construction costs are paid in full. Whether the amount of

---

[7] This is the information that the Committee that consists of industry professionals could have considered.

historical reimbursements cover the actual facility costs is not a consideration in Medicaid reimbursement.

¶108. The DOM did not offer any evidence that this payment history versus actual facility costs was used to calculate the reimbursement rate to any other nursing facility in this state. The DOM did not use this rationale to deny the ICF/IDDs its 120 percent multiplier. Rather, that multiplier was restored.

¶109. The DOM's position ignores that the formula for fair-rental value is intended to promote renovations and improvements to the Methodist facility. Methodist, through its reimbursement rate, must expend capital to keep the facility up-to-date and to prevent it from becoming obsolete. Daschbach testified that "a renovation is basically reducing the age of the facility, and fair rental value is based on the age of the facility. The newer the facility, the higher your property rate's going to be because your facility is worth more money." The DOM's reimbursement rate to the state's only NSFD is intended to provide sufficient capital for Methodist to renovate and upgrade its facilities to remain a state-of-the-art nursing facility for the severely disabled, and it can provide long-term care for some of Mississippi's most vulnerable people: the victims of head and spine injuries, patients permanently attached to ventilators, quadriplegics, and others who require total and maximum assistance with most activities of daily living.

¶110. The DOM's logic is as follows: why pay Methodist (or any other facility that has fully collected what its facility cost to build) anything less than the property payment? That is not how the fair-rental-value system is meant to work. The term "Fair Rental Value" (FRV) is

a calculation that compensates facilities for the use of the buildings, grounds, and equipment needed to care for Medicaid residents, explaining why the terms "fair" and "rental" are used. For example, if you have a building that is paid for and you decide to rent the building, you would set the fair-rental value, or the amount of rent, at an amount that a reasonable lessee was ready, willing, and able to pay to lease the building. To establish the rent amount, you could use the current construction costs to build a similar building. You could use comparative sales in the community to decide what a buyer may be willing to pay. Your could also use comparative rentals in the community to see what others were paying for a similar building. The mere fact that the building was paid for and you had covered actual construction or purchase costs from many years ago would not be a factor used to establish the fair-rental value.

¶111. The majority accepts the DOM's conclusion that Methodist received a "windfall" from these property payments. Yet no facts support that conclusion. The majority states that the DOM

> merely seeks to analyze the property-payment data that had been collected the past ten years for the state's only NFSD to check that the NBV adjustment that was agreed upon by the DOM and Methodist in 2004, when Methodist first opened, is adequately reimbursing the NFSD and to reevaluate the NBV adjustment rate if not.

Maj. Op. ¶ 28. The DOM and the majority recognize that this was based only on the "data that had been collected." The actual and correct data would require Methodist to provide the DOM with it's capital costs and expenditures on the facility since 2004. To determine whether Methodist actually received a "windfall" or was "adequately reimbursed," the DOM

44

would have to use the correct "property data," i.e., financial information from Methodist that would show all costs of construction, all costs of improvements, all costs of renovations, all costs of additions, and all amounts that Methodist had invested in the facility. The DOM's decision was arbitrary and capricious because neither the majority nor the DOM consider the actual or real "property data"; instead, the majority and the DOM only use the "property data" that it chose to use, knowing that such "property data" was not correct or up-to-date but was available. The State Plan only authorized the consideration of fair-rental value. If the DOM wanted to use actual "property data" then the DOM should have engaged in a discussion of the change with Methodist and asked for the actual "property data."

¶112. The State Plan says that the reimbursement formula is to be based on "new bed value"—the "new construction value per bed." The State Plan does not authorize the DOM to consider Methodist's payment history versus actual construction costs.

¶113. Therefore, I am of the opinion that the DOM's amendment to Methodist's NBV payment add-on value was arbitrary and capricious. Methodist was held to a different standard, and there is no support for the DOM's accusation that Methodist is gaining a "windfall." Indeed, no evidence was presented to support the DOM's claim that Methodist's overall costs were being excessively reimbursed.

¶114. This is exactly the type of consideration that the Legislature instructed the DOM to undertake and to report back with its recommendations. The DOM failed to allow the Committee to consider this issue. The DOM failed to notify Methodist of this consideration and give Methodist or other industry professionals an opportunity to present information

45

about this significant issue. There can be no doubt that the DOM's decision to make this change, at the last minute, under the cover of darkness, and without advising the state's only NFSD of the proposed change cannot be allowed to stand.

### III. Whether the DOM violated state and federal laws requiring notice.

#### A. Federal Law Requiring Public Notice

¶115. When a party asserts a lack-of-notice claim, the court should first examine the notice that was required and then compare it to the notice actually given.

##### 1. Notice Required

¶116. The DOM was required to publish notice of the amendment to the State Plan (SPA 15-004) under the requirements of 42 C.F.R. § 447.205. Under subsection (a), DOM was required to "provide public notice of any significant proposed change in its methods and standards for setting payment rates for services." 42 C.F.R. § 447.205(a). Under subsection (c), the notice must "[d]escribe the proposed change in methods and standards," estimate the increase or decrease expected in annual expenditures (if any), and "[e]xplain why the agency is changing its methods and standards . . . ." 42 C.F.R. § 447.205(c).

##### 2. Notice Given.

¶117. There is no quotation or cite to any portion of DOM's published notice. The hearing officer ruled,

> Methodist complains that it did not have adequate notice that its adjustment
> would be reduced. However, Methodist was aware that a general increase of

> new bed values was imminent and that changes to its adjustment percentage were being considered. Notice of the change was properly published. The Notice set forth a comment period. (Exhibit 16) No comments were received. Methodist's claim that the change was not properly noticed is without merit.

The majority concludes that the notice was sufficient because "it is evident from the record that Methodist had actual knowledge that *some change* to their adjusted NBV was imminent. . . . Methodist *either knew or should have known that the manner in which Methodist's NBV adjustment was calculated was going to change under SPA 15-004.* " Maj. Op. ¶ 48. This is correct. Methodist did have knowledge it would change. As discussed above, the simulation letter advised Methodist that its reimbursement would increase by 22.56 percent. And, the simulation letter did not indicate that there would be any change to the NBV payment add-on.

¶118. The majority then rules that "[t]he DOM's publication of notice included all of the information it was required to address according to 42 C.F.R. § 447.205 . . . ." Maj. Op. ¶ 49. But SPA-015 does not mention the reduction of Methodist's NBV add-on.

¶119. The hearing officer and the majority disregard the DOM's obligation under 42 C.F.R. § 447.205(a) to "provide public notice of *any* significant proposed change in its methods and standards for setting payment rates for services." (Emphasis added.) Likewise, they disregard the fact that subsection (c) required the DOM to "[d]escribe the proposed change in methods and standards," estimate the increase or decrease expected in annual expenditures (if any), and "[e]xplain why the agency is changing its methods and standards."

¶120. The change in Methodist's NBV calculation that reduced the payment add-on from

328.178 percent to a 175 percent multiplier was significant. In fact, at the hearing, Medicaid's counsel conceded that the change "does drop their property rate. It drops it from $67 to roughly $29. It's a significant drop. There's no question about that." Despite this, the published notice did not give any reason for Methodist or anyone else to expect a reduction in new-bed value for the state's only NFSD.

¶121. If we consider what Methodist actually knew or should have known, instead of what the DOM failed to include in the actual notice, we must consider additional facts. Neither the hearing officer, the chancellor, nor the majority cite any evidence to support the conclusion that Methodist had actual knowledge.

¶122. The Committee met and discussed possible draft plans. Shane Hariel, a Certified Public Accountant specializing in healthcare reimbursement, attended the Committee's meetings on behalf of the Mississippi Health Care Association and chaired the cost subcommittee, which focused on the issue of the new-bed value. He testified that the subcommittee proposed to raise the new-bed value to a realistic market amount and to compensate for this increase by lowering the rate of return on the new-bed value as well as reducing a factor separate from the property payment (the "return on equity payment"). He also testified that the discussion was focused on conventional nursing homes and their construction costs for new beds, not on Methodist's specialized facility, which Hariel did not recall having even been mentioned in that context. Hariel also testified that he did not recall that anyone from Medicaid ever discussed a change to the NBV payment add-on for Methodist.

48

¶123. There is simply no evidence to support the majority's conclusion that "[n]otice of the change was properly published." Neither the DOM, the hearing officer, the chancellor, nor the majority cites any evidence in the record. Despite this lack of evidence, the chancellor's order stated, "The published notice [of December 14, 2014,] disclosed the 175% multiplier challenged by Methodist in this appeal." This is not correct.

¶124. Further, as the majority recognizes the facts support the conclusion that the DOM decided to make this change just before the amendment was filed. Certainly, Methodist cannot have actual or constructive notice of any change that the DOM decided to make just before it was submitted.

¶125. I am of the opinion that the DOM failed to provide the proper public notice. I respectfully dissent from the majority's conclusion that notice was adequate.

### B.    State Law Requiring Public Notice

¶126. Because the earlier sections indicate my primary reasons to dissent, I do not believe it is necessary to address this issue. But I believe this issue presents a question that needs to be resolved. Is the DOM required to comply with Mississippi's Administrative Procedures Law? The majority says no; I say yes.

¶127. The Legislature expressly declared the public policy of this State as to Medicaid: "The division is an agency as defined under Section 25-43-3 and, therefore, must comply in all respects with the Administrative Procedures Law, Section 25-43-1 et seq." Miss. Code. Ann. § 43-13-137 (Rev. 2015). Under Mississippi Code Section 25-43-3.103 (Rev. 2018), a state

agency is required to provide its proposed rule changes to the Mississippi Secretary of State's office so that the public can be notified. The record reflects that the DOM did not file its proposed rule changes with the Secretary of State.

¶128. The DOM argues that the State Plan is not a "rule" under the Mississippi Administrative Procedures Act but is instead a contract between Mississippi and the federal government. Section 25-43-1.102(i) defines a "rule" as "the whole or a part of an agency regulation or other statement of general applicability that implements, interprets or prescribes . . . [l]aw or policy, or . . . [t]he organization, procedure or practice requirements of an agency." Miss. Code Ann. § 25-43-1.102(i) (Rev. 2018). The term "includes the amendment, repeal or suspension of an existing rule." *Id.*

¶129. The State Plan implements, interprets, and prescribes the law and policy of Medicaid reimbursement to providers, and SPA 15-004 amended the previous rule regarding the calculation of NBV for Methodist. Additionally, Section 25-43-1.102(i) has an exception for any "compact or agreement between an agency of this state and one or more agencies of another state or states," but it does not include an exception for an agreement between a state agency and a federal agency. Clearly the Legislature knows how to describe which agreements are or are not rules, and it did not choose to define "rule" to include state-federal compacts.

¶130. Either the State Plan is a rule or is not. Recently, in *Mississippi Division of Medicaid v. Windsor Place Nursing Center, Inc.*, I noted, "The majority finds no significance that the DOM determined it was necessary to amend the State Plan and the Instructions. *The DOM*

50

*followed the Administrative Procedures Act* and the amendments became effective on May 12, 2009." ***Miss. Div. of Medicaid v. Windsor Place Nursing Ctr., Inc.***, No. 2018-SA-01263-SCT, 2020 WL 2487330, at \*10 (Miss. May 14, 2020) (Griffis, J., dissenting) (emphasis added). In that case, the DOM decided the amendments should be submitted under the Administrative Procedures Law.

¶131. Here, the record shows that while the DOM determined it was necessary to amend the State Plan, it did not follow the Administrative Procedures Law. Accordingly, I respectfully dissent from the majority's opinion and find that the DOM failed to give proper notice as required by the Administrative Procedures Law.

¶132. For these reasons, I respectfully dissent.